IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CYNTHIA RAY,** | : | |
| **Plaintiff** | : | **CIVIL No. 1:13-CV-0073** |
| | : | |
| **v.** | : | |
| | : | |
| **CAROLYN W. COLVIN,** | : | |
| **Acting Commissioner of Social** | : | |
| **Security,**[1] | : | |
| | : | **Judge Sylvia H. Rambo** |
| **Defendant** | : | |

**M E M O R A N D U M**

In this appeal from a decision of the Commissioner of Social Security denying Disability Insurance Benefits, Plaintiff claims the administrative decision concluding that she is not disabled as defined by the Social Security Act is not supported by substantial evidence and contains errors of law.  For the following reasons, the court will remand the matter for further proceedings consistent with this opinion.

**I.**      **Background**

   **A.**      **Procedural Background**

On July 19, 2010, Plaintiff protectively applied for Title II Social Security Disability Insurance Benefits ("DIB").  (Doc. 1, ¶ 6.)  Plaintiff claimed disability beginning on December 31, 2008 (Doc. 1, ¶¶ 4-6), and listed the illnesses, injuries, or conditions that limited her ability to work as cervical spine impairment,

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Substitution of Carolyn W. Colvin for Michael J. Astrue is appropriate pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and the last sentence of 42 U.S.C. § 405(g).

lumbar spine impairment, degenerative disc disease, right shoulder impairment, sleep apnea, spinal stenosis, brittle diabetes, hypertensive cardiovascular disease, depression, and severe back pain (Doc. 6-6, p. 5 of 52).

The Social Security Administration initially denied Plaintiff's application by decision dated October 28, 2010.  (Doc. 6-4, pp. 4-8 of 31.)  On December 13, 2010, Plaintiff filed a timely request for an administrative hearing (*Id.* pp. 16-19), and a hearing was held on November 21, 2011, before Administrative Law Judge ("ALJ") Ron Sweeda.  (Doc. 6-2, pp. 14-44 of 45.)  Plaintiff, who was represented by counsel, appeared and testified at the hearing.  (Doc. 6-2, pp. 14-44 of 45.)  ALJ Sweeda issued an unfavorable decision to Plaintiff on December 9, 2011, finding that, although Plaintiff could no longer perform her past relevant work as a certified nurse's aide, she retained the residual functional capacity to perform a range of unskilled light work and, therefore, was not disabled within the meaning of the Social Security Act.  (Doc. 6-3, pp. 11, 16-17 of 23.)  A timely appeal was taken to the Appeals Council, and on November 13, 2012, the Appeals Council denied Plaintiff's request for review.  (Doc. 6-2, pp. 2-4 of 45.)  Therefore, the ALJ's decision became the decision of the Commissioner.

On January 10, 2013, Plaintiff filed an appeal to this court objecting to the Commissioner's final decision and requesting an award of benefits.  (Doc. 1.) The Commissioner filed an answer on April 9, 2013.  (Doc. 5.)  Pursuant to Local Rule 83.40.4, Plaintiff filed a brief in support of her appeal on June 19, 2013, in which she identified two errors: 1) the ALJ failed to properly evaluate the medical evidence; and 2) the ALJ failed to properly evaluate Plaintiff's subjective complaints.  (Doc. 11, p. 27 of 35.)  The Commissioner filed her brief in opposition

on July 18, 2013, maintaining that Plaintiff's asserted errors are without merit.  (Doc. 12.)

### B.    General Background

Plaintiff was born in the United States on October 3, 1962, and at all times relevant to this matter was considered a "younger individual,"[2] whose age would not seriously impact her ability to adjust to other work.  20 C.F.R. § 404.1563(c).  As of the date of the hearing, Plaintiff was five feet eight inches tall and weighed 256 pounds.  (Doc. 6-2, p. 19 of 45.)  She lived with her disabled husband, who was receiving worker's compensation, and her seven-year-old granddaughter.  (*Id.* at pp. 19 of 45. )  She had ten years of education, which is considered limited, and had prior relevant work experience as a certified nurse's aid. (*Id.* at p. 32 of 45.)

### C.    Impairment-Related Background

In June 2008, approximately six months prior to her alleged onset date, Plaintiff experienced a work-related injury due to lifting and repositioning a patient. (Doc. 6-7, pp. 67, 77 of 98.)  She treated primarily with physical medicine and rehabilitation physician Emmanuel Jacob, M.D. and neurologist John Cantando, D.O.

### 1.    Emmanuel Jacob, M.D., Treating Physical Medicine and Rehabilitation Physician

Prior to her initial evaluation by Dr. Jacob, Plaintiff was treated with physical therapy, trigger point injections, and pain medications without

---

[2] The Social Security regulations use the term "younger individual" to denote an individual age 18 through 49.  *See* 20 C.F.R. § 404.1563.  Plaintiff was 46 years old on her alleged onset date and 49 years old when ALJ Sweeda's decision was issued.  (Doc. 6-3, p. 11 of 23.)

improvement.  (Doc. 6-12, p. 143 of 145.)   An MRI taken on December 16, 2008, revealed a small full thickness tear in the distal aspect of the supraspinarus tendon. (*Id.*; Doc. 6-7, p. 40 of 98.)   In addition, a July 31, 2008 cervical spine MRI showed multi-level degenerative disc disease at C4-C5, C5-C6, and C6-C7.  (Doc. 6-12, p. 143 of 145.)

<u>**a.**</u>   <u>**Office Visits**</u>

At her first appointment with Dr. Jacob on April 16, 2009, Plaintiff reported that the pain in her mid back and right shoulder had intensified following her work-related injury and she was experiencing weakness.  (*Id.*)  She indicated that her symptoms severely restricted her activities of daily living, her sleep was restless, and she had stopped working due to her pain on December 31, 2008.  (*Id.*)  She rated her pain intensity as an eight out of ten.  (*Id.* at 144 of 145.)

Upon physical examination, Dr. Jacob noted that Plaintiff's muscle tone was spastic and she was "quite tender" along the C5-C6 of her spine.  (*Id.*)  Her cervical flexion was limited to thirty degrees, extension to thirty degrees, and rotation was forty degrees to the left and 45 degrees to the right. (*Id.*)  She was tender along the right supraspinatus muscle area and her right shoulder abduction was weak to approximately "4-/5."  (*Id.*)  She also had tenderness of the right supraclavicular fossa, and the muscle tone of the thoracid and lumbar paraspinals was spastic.  (*Id.*)  Likewise, she was "quite tender" along the dorsal spine and lumbar spine, and her lumbar motion was limited to sixty degrees.  (*Id.*)  There was paresthesia along the C5-C6 dermatome.  (*Id.*)  However, her straight leg elevation test was negative, the deep tendon reflexes of the biceps, triceps, knees, and ankles were intact, and her gait was stable.  (*Id.*)  Dr. Jacob's impressions were as follows: (1) injury to the right

shoulder, probable rotator muscle cuff tear; (2) cervical sprain and strain with radicular symptoms; (3) probable aggravation of preexisting cervical disc disease; (4) thoracic sprain and strain; (5) probable thoracic disc herniation; (6) lumbar sprain and strain; and (7) probable lumbar disc injury with herniation. (*Id*. at p. 145 of 145.) He ordered an updated MRI of the thoracic spine and concluded that Plaintiff was unable to return to work. (*Id*.) Her prognosis was guarded. (*Id*.)

On April 28, 2009, Dr. Jacob performed electrodiagnostic testing on Plaintiff, noting that her complaints included right-sided neck pain, right shoulder pain, and intermittent numbness and tingling in both hands. (Doc. 6-10, p. 23 of 121.) The study revealed abnormal findings of the right brachial plexopathy, upper trunk, and abnormal findings of cervical radiculopathy involving C5-C6 roots. (*Id*.) There were, however, no electrodiagnostic findings of diffuse peripheral neuropathy or myopathy. (*Id*.) Dr. Jacob also reviewed Plaintiff's April 24, 2009 thoracic spine MRI, which showed abnormal findings indicative of syrinx in the thoracic cord. (*Id*.) As a result of these studies, Dr. Jacob referred Plaintiff for cervical epidural injections to help alleviate her persistent neck pain and to a neurosurgeon for evaluation of her thoracic spine. (*Id*.) Dr. Jacob again concluded that Plaintiff was unable to return to work. (*Id*. at p. 25 of 121.)

In a follow-up visit on May 18, 2009, Plaintiff reported that she had ongoing pain in her neck and right shoulder area, as well as shooting pain from her back down to her right lower limb. (*Id*. at p. 21 of 121.) She reported no relief from cervical nerve block injections. (*Id*.) At this visit, she presented with severe pain along the right side of her shoulder with numbness and tingling sensations on the right hand. (*Id*.) She rated her pain as an eight out of ten. (*Id*.) Physical

examination revealed  muscle spasms along the cervical paraspinals and tenderness along the supraclavicular fossa and right lower trapezius muscles with muscle spasms.  (*Id*.)  Her right shoulder motion was limited and she had muscle tightness of the lumbar paraspinals.  (*Id*.)  Dr. Jacob treated her with acupuncture, augmented by infrared heat and soft tissue massage with Biofreeze.  (*Id*.)  He concluded that she remained unable to return to work.  (*Id*. at p. 22 of 121.)

On June 1, 2009, Plaintiff indicated that, although she was still experiencing neck, shoulder, and mid back pain, she was feeling a little better with Lyrica.  (Doc. 6-12, p. 131 of 145.)  A recent injection treatment and aquatic therapy, however, were not helping.  (*Id*.)  Dr. Jacob provided her with another round of acupuncture, augmented by infrared heat and soft tissue massage with Biofreeze. (*Id*.)  He also increased her dosage of Lyrica.  (*Id*.)  One week thereafter, Plaintiff reported feeling "much better" after the last injection treatment.  (*Id*. at p. 130.)  She received additional accupuncture.  (*Id*.)  On June 19, 2009, Plaintiff's neck and back pain persisted, but her shoulder pain was slightly improved.  (*Id*. at p. 127 of 145.) She received additional acupuncture.  (*Id*.)  Similarly, on June 23, 2009 and June 30, 2009, Plaintiff indicated that her pain continued and she received additional acupuncture treatments.  (*Id*. at pp. 125-126 of 145.)

On July 16, 2009, Plaintiff reported that her mid back pain continued and her right shoulder pain was shooting up the right side of her neck.  (*Id*. at p. 124 of 145.)  She again rated her pain intensity as an eight out of ten.  (*Id*.)  Examination revealed muscle spasms along the right upper trapezius muscles and dorsal spine, tender trigger points along the right upper trapezius and rhomboidus muscles, and limited right shoulder motion.  (*Id*.)  Dr. Jacob injected Marcaine mixed with Depo-

Medrol to Plaintiff's right upper trapezius muscles. (*Id*.) At her next visit on July 24, 2009, Plaintiff indicated that her right shoulder pain persisted and she had increasing low back pain with radicular symptoms. (*Id*. at p. 123 of 145.) Dr. Jacob provided acupuncture treatment and recommended a lumbar MRI. (*Id*.) One week later, Plaintiff reported significant relief from the previous injection treatment administered on July 16, 2009. (*Id*. at p. 122 of 145.) She rated her pain as a three or four out of ten. (*Id*.) Dr. Jacob treated her mid back and shoulder pain with acupuncture. (*Id*.)

Plaintiff had the lumbar MRI, as ordered by Dr. Jacob, on August 7, 2009. (*Id*. at p. 120 of 145.) The MRI revealed moderate multilevel spinal stenosis from L2-L3 through L6-S1, due to congenitally shortened pedicles and, in some instances, aggravated by prominence of epidural fat and mild bulging. (*Id*. at p. 121 of 145.) In addition, there was minimal to moderate foraminal stenosis at L4-5 with moderate to severe foraminal stenosis at L5-S1, mostly due to facet hypertrophy. (*Id*.)

In a follow-up visit with Dr. Jacob on August 14, 2009, Plaintiff reported that acupuncture was providing "good relief" to her shoulder and back area, but that the medication from the injection treatments was wearing off. (*Id*. at p. 119 of 145.) She was experiencing sever pain in her lower back. (*Id*.) Upon examination, Dr. Jacob noted that the muscle tone in her thorasic spine and lumbar spine was spastic and her dorsal and lumbar motion was limited. (*Id*.) He treated her with acupuncture. (*Id*.) On September 4, 2009, Plaintiff's back pain persisted and Dr. Jacob provided additional acupuncture and a refill of Zanaflex to treat her muscle spasms. (*Id*.) On September 18, 2009 and September 25, 2009, Plaintiff's

7

complaints of mid back and shoulder pain remained unchanged and she, once again, received acupuncture. (*Id*. at p. 117 of 145.)

At a visit on October 16, 2009, Plaintiff reported that the acupuncture was helpful, but that she was still experiencing mid back and shoulder pain. (*Id*. at p. 113 of 145.) Upon physical examination, Dr. Jacob observed that the muscle tone in her dorsal spine was tight but that the dorsal motion was more flexible. (*Id*.) She remained tender along the anterior and medial capsule of her right shoulder, with limited motion of the shoulder. (*Id*.) He provided additional accupuncture. (*Id*.) Similarly, on October 23, 2009, her back pain persisted and she received acupuncture. (*Id*. at p. 112 of 145.)

On November 13, 2009, Plaintiff informed Dr. Jacob that the thoracic flacet block injection treatments given by Dr. Paz (*see* Doc. 6-12, pp. 114-115 of 145) were not improving her symptoms (*Id*. at p. 111 of 145). Upon examination, Dr. Jacob observed muscle spasms along her thoracic paraspinals and tenderness along the upper trapezius muscles. (*Id*.)   She received acupuncture and was prescribed Skelaxin. (*Id*.)

On November 20, 2009, Plaintiff reported mid back pain that increased with activity, pain along the right side of her chest wall, and pain in her right shoulder. (*Id*. at p. 110 of 145.) Upon examination, Dr. Jacob noted spastic muscle tone in the dorsal spine and tenderness along the right middle trapezius muscles. (*Id*.) He treated Plaintiff with acupuncture. (*Id*.) During three subsequent visits between December 4, 2009 and December 18, 2009, Plaintiff's back and right shoulder pain persisted and she received acupuncture treatments. (*Id*. at pp. 107-109 of 145.) On January 15, 2010, Plaintiff reported that her pain continued and that the

injections given by Dr. Paz were not providing any relief. (*Id*. at p. 103 of 145.) Dr. Jacob's examination revealed muscle spasms along the right thoracic and scapularis muscles and tenderness along the right shoulder and upper lumbar spine. (*Id*.) He provided additional acupuncture. (*Id*.)

In a follow-up visit on January 22, 2010, Plaintiff indicated that her right shoulder pain had increased and her back pain persisted. (*Id*. at p. 102 of 145.) She rated her pain as an eight out of ten. (*Id*.) During the examination, Dr. Jacob noted that Plaintiff was quite tender along the anterior and medial capsule of the right shoulder and along the subacromial bursa area. (*Id*.) He observed muscle spasms along the thoracic and lumbar paraspinals and limited right shoulder motion. (*Id*.) A sonogram performed during the appointment revealed echogenic changes of the right shoulder indicative of subacromial bursitis. (*Id*.) Dr. Jacob administered a Marcaine/Depo-Medrol shot with sonographic guidance. (*Id*.) In addition, he reviewed Plaintiff's job description as a certified nurse's aide and determined she was unable to perform the functions of the job. (*Id*.) He also restricted her to lifting ten pounds. (*Id*.)

In three visits between January 29, 2010 and February 19, 2010, Plaintiff reported ongoing back and shoulder pain, and she received acupuncture treatments. (*Id*. at pp. 95, 100-101 of 145.) At the third appointment, Dr. Jacob performed an examination, noting that the muscle tone in her mid back was spastic and she was "quite tender" along the dorsal spine and right shoulder area. (*Id*. at p. 95 of 145.)

A February 19, 2010 cervical spine MRI revealed developmental narrowing of the cervical spine canal with straightening of normal cervical lordosis

and multilevel spondylotic and degenerative changes.  (*Id*. at p. 96 of 145.)  In addition, it showed prominent spondylotic and degenerative changes causing signifcant narrowing of the right neural foramen at C4-C5 and a small protruding disc herniation at C6-C7 that slightly indented the ventral thecal sac.  (*Id*. at pp. 96-97 of 145.)

At a follow-up visit with Dr. Jacob on March 5, 2010, Plaintiff reported that her neck, shoulder, and mid back pain persisted, and she was treated with acupuncture.  (*Id*. at p. 94 of 145.)  On March 12, 2010, Plaintiff indicated that she had increased pain along her mid to upper back as well as in the right scapularis area.  (*Id*. p. 93 of 145.)  Upon examination, Dr. Jacob observed muscle spasms along the right upper trapezius and thoracic paraspinal muscles and tender trigger points with muscle spasms along the right trapezius muscles and upper thoracic paraspinals.  (*Id*.)  He administered Marcaine/Depo-Medrol injections to Plaintiff's right trapezius muscles and upper thoracic paraspinals.  (*Id*.)  Her pain persisted on March 19, 2010, and she was treated with acupuncture.  (*Id*. at p. 92 of 145.)

On March 29, 2010, Plaintiff underwent cervical disc surgery by Dr. Cantando.  (*Id*. at p. 91 of 145.)  At her next appointment with Dr. Jacob on April 23, 2010, Plaintiff reported that her neck and shoulder pain were slightly improved following the surgery, but that her mid back pain persisted.  (*Id*.)  Dr. Jacob's examination revealed tenderness along the mid dorsal spine with muscle spasms and limited dorsal and cervical motion.  (*Id*.)  On April 30, 2010 and May 14, 2010, Plaintiff indicated that she continued to experience neck, shoulder, and mid-back pain, and she received additional acupuncture treatments .  (*Id*. at pp. 89-90 of 145.)

At a follow-up visit on June 25, 2010, Plaintiff reported that she continued to have pain along the right shoulder blade area and some neck and back pain. (*Id*. at p. 86 of 145.) She rated her pain as an eight out of ten. (*Id*.) Dr. Jacob observed tender trigger points with muscle spasms along the right middle and lower trapezis muscles and limited right shoulder motion. (*Id*.) He administered Marcaine/Depo-Medrol injections in her right lower and middle trapezius muscles. (*Id*.) On July 23, 2010, Plaintiff complained of increased pain down her right shoulder, but reported slight improvement of her mid back pain. (*Id*. at p. 85 of 145.) She rated her pain at an eight out of ten. (*Id*.) Dr. Jacob reviewed an MRI of her right shoulder, which revealed acromioclavicular degeneration. (*Id*.) He used a sonogram to examine the area and observed echogenic changes indicative of acromioclavicular joint degenerative arthritis and bursitis. (*Id*.) He administered an additional Marcaine/Depo-Medrol injection into the area. (*Id*.)

On September 17, 2010, Plaintiff continued to complain of pain in her neck, shoulder, and mid back. (Doc. 6-14, p. 34 of 111.) Dr. Jacob noted muscle spasm of the cervical and thoracic paraspinals and observed that Plaintiff's cervical motion was "quite restricted." (*Id*.) She was instructed to do in home exercises and advised to take Flexeril, as needed, for muscle spasm. (*Id*.) Plaintiff's complaints persisted on December 17, 2010, and Dr. Jacob noted that she had numbness of both hands and her pain was about a six out of ten. (*Id*.) Her examination revealed muscle spasm of the cervical paraspinals and tenderness in the cervical and lumbar spine. (*Id*.) Cervical, thoracic, and lumbar motion was restricted. (*Id*.) Dr. Jacob advised her to continue with home stretching exercises and Flexiril. (*Id*.)

On October 12, 2010, Plaintiff rated her pain as a six out of ten.  (*Id*. at p. 111 of 140.)  Dr. Jacob's physical examination revealed tenderness along the C5-6-7 segment, palpable muscle spasm of the cervical paraspinals, and diminished sensation along the C5-6 dermatome.  (*Id*.)   Cervical flexion was restricted to thirty degrees, extension to thirty degrees, right rotation to thirty degrees, and left rotation to 35 degrees. (*Id*.)  There was additional tenderness along the right supraclavicular fossa, right supraspinatus muscle, and the thoracic and lumbar spine. (*Id*.)  Dr. Jacob also noted palpable muscle spasms along the lumbar paraspinals. (*Id*.)  Lumbar flexion was limited to sixty degrees. (*Id*.)  However, her straight leg elevation test was negative and her biceps, triceps, knee, and ankle reflexes were present and symmetric. (*Id*.)  Her gait was stable. (*Id*.)

In a follow-up visit on July 22, 2011, Dr. Jacob noted that Plaintiff's neck and back pain persisted and increased with activity.  (*Id*. at p. 87 of 111.)  She was taking Tramadol. (*Id*.)  An examination showed muscle spasm along the cervical paraspinals and tenderness along the C5-6-7 segment. (*Id*.)  Her cervical and lumbar motion was limited and there was tenderness along the thoracic and lumbar spine. (*Id*.)  She was advised to maintain good health habits and continue home exercises. (*Id*.)

### b.    Reports

On October 12, 2010, Dr. Jacob submitted a report and questionnaire to the state agency regarding Plaintiff's limitations.  (Doc. 6-13, pp. 101-114 of 140.) In the report, he wrote that Plaintiff had ongoing complaints of neck, shoulder, and mid back pain stemming from work-related injuries. (*Id*. at p. 109 of 140.)  Her treatment has included physical therapy, pain medications, acupuncture, nerve block

injections, and cervical disc surgery with fusion. (*Id.*) He noted that the neck surgery did not completely abate her symptoms, and that her symptoms increased with activity and were partially mitigated by rest and medication. (*Id.*) At that time, she was taking Lisinopril, Celexa, Metformin, Glimiperide, Zocor, Flexeril, and ibuprofen. (*Id.*) Her medical history was notable for diabetes, elevated cholesterol, high blood pressure, and depression. (*Id.* at p. 110 of 140.) Dr. Jacob also provided a synopsis of Plaintiff's most recent physical examination, which was conducted that day. (*Id.* at p. 111 of 140.)

In addition, Dr. Jacob wrote that an April 24, 2009 MRI of Plaintiff's right shoulder revealed increased fatty infiltration in the deltoid muscle and infraspinatus muscles, suggesting atrophy and possibly relating to brachial neuritis. (*Id.*) An MRI of the thoracic spine, also taken on April 24, 2009, suggested a syrinx in the thoracic cord extending from T3 through T11-T12. (*Id.*) Electrodiagnostic testing, conducted on April 28, 2009, showed cervical radiculopathy at the bilateral C5-C6 roots. (*Id.*) An MRI of the lumbar spine, taken on December 16, 2008, showed moderate multilevel spinal stenosis from L2-3 through L5-S1. (*Id.*) An MRI of the right shoulder taken the same day showed a probable small full thickness tear of the distal supraspinatus tendon and small joint effusion. (*Id.*) Finally, a July 31, 2008 MRI of the cervical spine indicated degenerative disc disease at C4-5, C5-6, and C6-7, with stenosis at C4-5 and C5-6. (*Id.*)

Dr. Jacob's diagnoses included: (1) cervical disc disease with radiculopathy; (2) cervical disc surgery with fusion; (3) impingement syndrome of the right shoulder; (4) probable right brachial plexus neuritis and right supraspinatus

muscle tear; (5) thoracic spine syrinx by MRI; and (6) lumbar disc disease with spinal canal stenosis.  (*Id*.)  He added that Plaintiff:

> [Had] subjective complaint[s] of neck pain, right shoulder pain, mid back pain[,] and low back pain.  She [had] objective findings of changes in sensation, limited motion[,] and muscle weakness.  She also [had] verifiable objective findings of cervical disc disease with radiculopathy.  She [had] objective finding[s] of thoracic syrinx with MRI and lumbar disc disease with spinal canal stenosis.

(*Id*.)

In the Spinal Impairment Questionnaire accompanying his report, Dr. Jacob indicated that he began treating Plaintiff on April 16, 2009 and saw her most recently that day.  (*Id*. at p. 101 of 140.)  He noted that he sees her once every one to three months.[3]  (*Id*.)  According to Dr. Jacob, in an eight-hour workday, Plaintiff could sit for a total of six hours and stand or walk for a total of two hours.  (*Id*. at p. 104 of 140.)  She would need to get up hourly to move around for five to ten minutes before returning to her seat.  (*Id*.)  She could frequently lift and carry up to five pounds and occasionally lift and carry up to ten pounds.  (*Id*.)  She could not push, pull, or bend.  (*Id*. at p. 107 of 140.)

Dr. Jacob also indicated that Plaintiff's symptoms were severe enough to frequently interfere with her attention and concentration.  (*Id*. at p. 105 of 140.)  Her condition would also interfere with her ability to keep her neck in a constant position, such as a position necessary to look at a desk or computer screen.  (*Id*. at p. 106.)  Her impairments were deemed ongoing and expected to last at least twelve

---

[3] As is evident from the medical records, summarized *supra* Part I.C.1.a, Dr. Jacob actually treated Plaintiff on a much more frequent basis.

months.  (*Id*. at p. 105 of 140.)  Dr. Jacob opined that she could not perform full time
work and noted that she had both good days and bad days and would likely be absent
from work once a month due to her condition.  (*Id*. at p. 106 of 140.)    Dr. Jacob
noted that Plaintiff would need to avoid wetness, noise, fumes, gases, dust,
temperature extremes, humidity, and heights (*Id*. at 107 of 140), and further stated
that emotional factors, including anxiety, contributed to the severity of her symptoms
(*Id*. at p. 105 of 140).  Dr. Jacob did not believe Plaintiff to be a malingerer.  (*Id*. at
106 of 140.)

        In a subsequent report to the state agency dated July 1, 2011, Dr. Jacob
wrote that Plaintiff's persistent neck pain, right shoulder pain, and mid and low back
pain increased with activity and continued to restrict her activities of daily living.
(Doc. 6-14, p. 35 of 111.)  In particular, Dr. Jacob noted that Plaintiff had difficulty
bathing, dressing, writing, typing, grasping, seeing, standing, sitting, walking, lifting,
and climbing stairs.  (*Id*. at p. 36 of 111.)  He also provided a summary of his
physical findings and diagnoses, which was identical to that included in his October
12, 2010 report.  (*Id*. at pp. 37-38 of 111.)  In conclusion, Dr. Jacob opined that
Plaintiff:

> [H]as permanent impairment of the cervical spine due to
> cervical disc disease with spinal stenosis and
> radiculopathy.  She has permanent impairment of the
> lumbar spine due to lumbar degenerative disc disease with
> spinal canal stenosis.  She also has impairment of the right
> upper limb due to impingement syndrome, and brachial
> neuritis.

(*Id*. at p. 38 of 111.)  He explained that Plaintiff's impairments are verified by
diagnostic testing, including MRIs and electrodiagnostic testing, and objective
physical examinations, including limited motion, muscle weakness, and changes in

sensation.  (*Id*.)  He wrote that the objective findings and Plaintiff's subjective complaints "translate to difficulty of her activities of daily living and severe disability."  (*Id*.)  He added that her prognosis is poor and she is totally disabled from returning to any substantial gainful employment.  (*Id*.)

## 2.    Dr. John Cantando, D.O., Treating Neurosurgeon[4]

Referred by Dr. Jacob, Plaintiff presented to Dr. Cantando on July 2, 2009, for an evaluation of her mid back pain.  (Doc. 6-10, p. 40 of 121.)  Dr. Cantando's examination of Plaintiff's neck area revealed paracervical and trapezial muscle spasm bilaterally with limitation in cervical range of motion, although she remained functional.  (*Id*. at p. 42 of 121.)  Her strength was five out of five and her gait was normal.  (*Id*.)  Patellar reflexes bilaterally where +1/4 and Achilles reflexes were absent.  (*Id*.)  Dr. Cantando reviewed her thoracic spine MRI and noted no significant trauma to the back.  (*Id*. at p. 40 of 121.)  He did not believe her syrinx was the cause of her pain, and noted no neurological defects or expansion of cord.  (*Id*.)  He ordered a contrast thorasic spine MRI to confirm the absence of a tumor in the syrinx.  (*Id*. at p. 42 of 121.)  The MRI was performed on July 9, 2009, and

---

[4] That Plaintiff was seen by several other physicians during the relevant time is not dispositive to the matter *sub judice*, due to the court's ultimate finding that the ALJ failed to properly consider Dr. Jacob's opinions.  Nevertheless, the court sets forth pertinent portions of Dr. Cantando's records and the examining consultants' findings in order for the parties to appreciate the factual record before the ALJ. The court, however, will not address Plaintiff's visits with Dr. Menio, her primary care physician, as those appointments primarily pertained to her weight, depression, and fatigue.  (*See*, e.g., Doc. 6-12, pp. 27-30, 65-72 of 145).  Likewise, the court will not summarize the findings of Joseph Barret, Ph.D., state agency psychologist.  (Doc. 6-13, pp. 115-127 of 140.)  While these issues are applicable to Plaintiff's eligibility for benefits, the court does not find them pertinent to the instant matter, *i.e.*, as to whether the ALJ properly considered Dr. Jacob's opinions regarding Plaintiff's muscoleskeletal impairments.

revealed mild central disc bulges at T3-T4 and T4-T5 causing indentation in the thecal sac. (*Id*. at p. 58 of 121.) The rest of the levels were unremarkable. (*Id*.)

In a follow-up visit with Dr. Cantando on October 2, 2009, Plaintiff indicated that physical therapy and pain management were not helpful and that she was experiencing numbness in her feet and hands. (*Id*.) Her physical examination was unremarkable. (*Id*. at p. 76 of 121.) Dr. Cantando noted, however, that an August 7, 2009 lumbar MRI showed congenitally shortened pedicles and mild-to-moderate disc disease. (*Id*.) He referred Plaintiff to an orthopedist and explained that he did not believe surgical intervention would be helpful. (*Id*.)

On March 18, 2010, Plaintiff returned to Dr. Cantando, after being referred by the orthopedist[5] for possible cervical spine surgery (*Id*. at p. 111 of 121.) She described an intermittent burning sensation from her neck through her right shoulder and extending into her arm that increased with activity and woke her from sleep. (*Id*.) She reported that she had difficulty standing for more than ten minutes, sitting for more than thirty minutes, and walking for more than a block. (*Id*.) Nine weeks of physical therapy and three facet injections did improve her symptoms, but an injection in the neck one week prior to the appointment did provide some relief. (*Id*.) Dr. Cantando conducted an examination, which was remarkable for a positive Spurling's Sign and decreased sensation to soft touch and pinpricks in the right arm

---

[5] The record documents four visits with the orthopedist, Dr. Charlton, between January 2009 and February 2010. His impression was cervical disc syndrome with muscle spasm and shoulder bursitis. (Doc. 6-8, p. 38 of 109.) Initially, Dr. Charlton treated Plaintiff's symptoms with physical therapy and shoulder cortisone injections. (*Id*. at p. 39 of 109.) She showed improvement and on March 27, 2009, Dr. Charlton felt that her shoulder required no further treatment and that her cervical spine could be treated with pain management. (*Id*.) He also felt she could perform light duty work. (*Id*.) However, on February 16, 2010, he recommended a neurosurgical consultation for her cervical disc disease with shoulder pain. (*Id*. at p. 37 of 109.)

and leg.  (*Id*. at p. 112 of 121.)  Her back was nontender along the spine and paraspinal regions and there were no palpable muscle spasms.  (*Id*.)  Dr. Cantando noted that a February 19, 2010 cervical spine MRI showed a C4-C5 central herniation with right eccentricity, right C5 nerve root compression, C4-C5 stenosis disc osteophyte complex, thecal sac effacement, and straightening of lordosis.  (*Id*. at p. 113 of 121.)  In addition, an April 2009 EMG revealed right brachial plexopathy, upper trunk and chronic cervical radiculopathy at C5-C6.  (*Id*.)  Dr. Cantando's assessment was cervical degenerative disc disease at C4-C5, complaints correlating with MRI, and cervicalgia.  (*Id*.)  He recommended a C4-C5 cervical discectomy and fusion.  (*Id*.)

Dr. Cantando performed Plaintiff's surgery on March 31, 2010.  (Doc. 6-9, pp. 2-9 of 56.)  In her post-surgical follow-up visit on May 7, 2010, Plaintiff reported that she was happy with the results of her surgery because her right arm and shoulder pain were much better.  (Doc. 6-11, p. 20 of 95.)  However, she  still experienced posterior neck and interscapular pain.  (*Id*.)  Dr. Cantando described the range of motion in Plaintiff's neck as "adequate."  (*Id*.)

At a subsequent visit on July 23, 2010, Plaintiff reported increased neck and bilateral shoulder pain.  (*Id*. at p. 32 of 95.)  She found no relief from injections, Skelaxin, Percocet, or physical therapy.  (*Id*.)  Upon examination, Dr. Cantando noted spasms in the trapezius bilaterally with trigger points.  (*Id*.)  He sent her for an immediate x-ray and recommended that she follow up with pain management that day.  (*Id*.)  He instructed her to lift no more than ten pounds, increasing ten pounds per month as tolerable.   (*Id*. at p. 33 of 95.)  Dr. Cantando noted that she could walk and climb stairs as tolerated, but that she should refrain from bending or twisting.

(*Id*.)  She was directed not to sit upright for more than forty minutes at a time, up to four times per day.  (*Id*. at p. 33 of 95.)

### 3.   Scott Prince, D.O., State Agency Examining Consultant

On October 12, 2010, Plaintiff presented to Dr. Prince and reported that, following her cervical fusion in March 2010, she still had some pain but it had improved.  (Doc. 6-13, p. 94 of 140.)  Her low back and shoulder pain persisted. (*Id*.)  Upon examination, her neck appeared normal.  (*Id*. at p. 95 of 140.)  Plaintiff walked with a normal gait and station and was able to take a few steps on her toes and heals.  (*Id*. at p. 96 of 140.)   She could squat, though her left knee was painful, and she was able to rise from the squat while holding onto support.  (*Id*.)  She had limited motion in her neck, spine, and right arm, and full range of motion in her legs. (*Id*.)  Dr. Prince concluded that Plaintiff had cervical disc disorder, lumbar disc disorder, benign hypertension, and type 2 diabetes.  (*Id*.)  Dr. Prince opined that Plaintiff could sit for eight hours in a workday, alternating between sitting and standing at her option, and that she could stand or walk for four hours.   (*Id*. at p. 97 of 140.)  She could frequently bend, kneel, stoop, crouch, balance, and climb.  (*Id*. at p. 98 of 140.)

### 4.   Kurt Maas, M.D., State Agency Physician

In late October 2010, Kurt Maas, M.D., a state agency physician, reviewed the evidence in connection with Plaintiff's initial application and opined that Plaintiff could perform a limited range of light work.  (Doc. 6-13, pp. 134-140 of 140.)  In making this determination, he considered Plaintiff's course of treatment, including a cervical fusion that improved her symptoms; her daily activities; her lack

19

of reliance on any assisted devices; and the physical findings that she had a normal gait and station, limited range of motion in her neck, slightly limited range of motion in her right shoulder, normal strength and sensation, and normal deep tendon reflexes. (*Id.* at pp. 139-140 of 140.)

### C.   Hearing Testimony

At her November 21, 2011 hearing, Plaintiff testified that she could no longer work because her neck and back pain prevented her from remaining in one position for any length of time. (Doc. 6-2, pp. 21-22 of 45.) Specifically, Plaintiff testified that she had to rest her neck after sitting for approximately ten minutes, she cannot walk more than two blocks, and she experiences "a lot of low back pain" after standing for about fifteen minutes. (*Id.* at pp. 21-22 of 45.) Plaintiff added that lifting a gallon of milk caused her a lot of pain in her neck and back, and that, after using her right (dominant) hand for about ten minutes, she experienced pain in her arm and shoulder. (*Id.*) When asked by the ALJ why the onset of the pain was not immediate, Plaintiff responded:

> I'm not sure, but when I – like anything I do with this arm, like, for instance, if I'm on the telephone, I can hold the telephone for maybe five minutes, and then, after that, I need to have my neck rested, and I usually put a pillow on the phone to hold it up to my ear, because my arm gets so weak after a couple of minutes. Now I'm not sure why that happens like that, but it's very weak.

(*Id.* at p. 23 of 45.) Plaintiff testified that she cannot type on the computer for more than ten minutes due to the pain. (*Id.* at pp. 30-31.)

Plaintiff further testified that she only drives occasionally for short distances because her neck pain makes it difficult for her to turn her head. (*Id.* at p. 20 of 45.) She also testified that it is difficult to reach her neck in the shower and

she cannot lift her right arm above her head.  (*Id.* at p. 26 of 45.)  In terms of housework, she may wipe the kitchen counters, but her husband vacuums.  (*Id.* at p. 27 of 45.)  A friend occasionally comes over to help her go to the store and carry groceries.  (*Id.*)

Plaintiff testified that her neck surgery in March 2010 resulted in an initial improvement in her neck symptoms, but, shortly thereafter, the pain returned to its pre-surgery level.  (*Id.* at p. 28 of 45.)  She was, however, able to hold her neck up longer than she could prior to the surgery.  (*Id.*)  According to her testimony, she found that ibuprofen helped to alleviate some of her neck pain.  (*Id.* at p. 23 of 45.)  She also experienced muscle spasms throughout the day, and, though somewhat helpful, Flexeril was not very effective in controlling the spasms.  (*Id.* at pp. 23-24 of 45.)  Plaintiff testfied that she used a TENS unit three to four times a week, which helped alleviate her back pain for a couple of hours.  (*Id.* at p. 29 of 45.)  She has gone to physical therapy six or seven times (*Id.*), but she is barely able to get out of bed due to the pain approximately once per week (*Id.* at p. 30 of 45).

During the hearing, the ALJ posed the following hypothetical to Michele Giorgio, a vocational expert:

> Let's assume that a person of the claimant's age, education, location and work experience, can lift and carry [twenty] pounds occasionally, [ten] pounds frequently.  Sit for six, stand and walk for four hours in a normal work day. Postural restrictions in that they should not be climbing ladders of scaffolds, crawling or kneeling, no overhead work, and only occasional reaching [beyond arm's length] with the right upper extremity.  No full exposure to temperature extremes, high humidity or vibration.

(*Id.* at p. 33-34 of 45.)  Based on the hypothetical, Ms. Giorgio testified that such an individual could not perform Plaintiff's past relevant work experience as a certified

nurse's aide, but could perform light duty, unskilled jobs, such as: (1) reception/information clerk; (2) usher/lobby attendant/ticket taker; and, (3) personal care/service worker.  (*Id*. at p. 34 of 45.)  According to Ms. Giorgio, the individual could perform those jobs even if she was limited to simple, repetitive tasks.  (*Id*. at p. 34 of 45.)

Next, the ALJ added two additional limitations to the hypothetical: occasional lifting of no more than ten pounds and the requirement to sit or stand at least every fifteen minutes.  (*Id*. at p. 35.)  Based on these additional limitations, Ms. Giorgio testified that the individual could perform unskilled, sedentary jobs such as: (1) reception/information clerk; (2) general officer clerk; and, (3) protective service worker.  (*Id*.)  The ALJ then added to the hypothetical a limitation that the individual would miss work at least three times per month unexpectedly, and Ms. Giorgio responded that she would be unemployable.  (*Id*.)

Thereafter, Plaintiff's counsel added one final limitation to the hypothetical, that the person must take a five to ten minute break to rest every hour.  (*Id*. at p. 36 of 45.)  Ms. Giorgio again testified that the individual would be unemployable.  (*Id*.)

## II.        Standard of Review

A district court's review of the Commissioner's decision is quite limited.  *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005).  The scope of review by this court is restricted to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact.  42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  Findings of fact by the

Commissioner are considered conclusive provided they are supported by "substantial evidence," a standard that has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003) (quoting *Richardson*, 402 U.S. at 401). "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

This court does not undertake a *de novo* review of the decision and does not re-weigh evidence presented to the Commissioner. *Schoengarth v. Barnhart*, 416 F. Supp. 2d 260, 265 (D.Del. 2006) (citing *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). The substantial evidence standard is differential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence. *See id*. If the decision is supported by substantial evidence, the reviewing court must affirm the decision, even if the record contains evidence which would support a contrary conclusion, *Panetis v. Barnhart*, 95 F. App'x 454, 455 (3d Cir. 2004), or if the court itself "would have decided the factual inquiry differently," *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).

## III.     **Discussion**

Plaintiff argues that the ALJ failed to properly evaluate the medical evidence and failed to properly evaluate Plaintiff's subjective complaints of pain. Before addressing Plaintiff's arguments, the court will first discuss the administrative framework applicable to determinations of benefit eligibility and then set forth the key points of the ALJ's decision.

### A.     **Administrative Framework**

In determining whether a claimant is eligible to receive disability insurance benefits, the burden is on the claimant to show that she has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe she is unable to pursue substantial gainful employment[6] currently existing in the national economy.  Applicable to Plaintiff, a "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months."  42 U.S.C. § 423(d)(1)(A); *Ramirez v. Barnhart*, 372 F.3d 546, 550 (3d Cir. 2004).  A claimant is considered to be unable to engage substantial gainful activity "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do his previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  To receive DIB, a claimant must also show that she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which she was last insured.  42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a).  In the instant case, the Commissioner does not dispute that Plaintiff satisfies the first two non-medical requirements and the parties do not object to the ALJ's finding that Plaintiff's date of

---

[6]  According to 20 C.F.R. 416.972, substantial employment is defined as "work activity that involves doing significant physical or mental activities."  "Gainful work activity" is the type of work usually done for pay or profit.

last insured for purposes of receiving disability benefits was September 30, 2011. (Doc. 11, p. 2 of 35.)

To determine a claimant's rights to DIB, the ALJ conducts a formal five-step evaluation process:

> (1) if the claimant is working or doing substantial gainful activity, he cannot be considered disabled;
>
> (2) if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits his ability to do basic work activity, he is not disabled;
>
> (3) if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;
>
> (4) if the claimant retains sufficient residual functional capacity ("RFC")[7] to perform his past relevant work, he is not disabled; and
>
> (5) if, taking into account the claimant's RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional, or national economy, he is not disabled.

*See* 20 C.F.R. § 416.920(a)(4); *see also Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000). The claimant bears the burden of proof for steps one, two, and four of this test. *Sykes v. Apfel*, 228 F.3d 259, 263 (3d Cir. 2000). The Commissioner bears the burden of proof for the last step to show that the claimant is capable of performing

---

[7] Briefly stated, RFC is the most a claimant can do despite his recognized limitations. Social Security Ruling 96-9p defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, *i.e.,* 8 hours a day, for 5 days a week, or an equivalent work schedule.

other jobs existing in significant numbers in the national economy.  *Id.* (citing *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987)).

When challenging the ALJ's conclusion regarding the third step, the claimant bears the burden of proof.  *See Crostly v. Astrue*, Civ. No. 10-cv-0088, 2011 WL 5026341, *2 (W.D. Pa. Oct. 21, 2011) (citing *Davis v. Commissioner of Soc. Sec.*, 105 F. App'x 319, 323 (3d Cir. 2004)); *see also Ramirez*, 372 F.3d at 550. Specifically, "[f]or a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original).  Moreover, for a claimant to prove that her impairment is equivalent to a listing, she must "proffer medical findings which are equal in severity to *all* the criteria for the one most similar listed impairment." *Stremba v. Barnhart*, 171 F. App'x 936, 938 (3d Cir. 2006) (citing *Sullivan*, 493 U.S. at 530) (emphasis added).

## B.      ALJ's Decision

Following the prescribed analysis, the ALJ first concluded that Plaintiff has not engaged in substantial gainful activity since December 31, 2008, the alleged onset date of her disability.  (Doc. 6-3, p. 9 of 23.)  In resolving step two, the ALJ found that, through the date of last insured of September 30, 2011, Plaintiff suffered from the following severe impairments: obesity, diabetes, sleep apnea, hypertension, degenerative joint disease, degenerative disc disease, and depression.  (*Id.*)  At step three, the ALJ determined that none of Plaintiff's impairments, or combination thereof, met or medically equaled the severity of a listed impairment.  (*Id.*)

Concluding that no single impairment or combination of impairments was severe enough to equal listing severity, the ALJ went on to step four to consider Plaintiff's RFC.  The ALJ concluded:

> The claimant [has] the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). [Plaintiff] can lift and carry 20 pounds occasionally and ten pounds frequently.  She can sit up to 6 hours in an 8-hour workday and stand or walk up to 4 hours in an 8-hour workday. [Plaintiff] cannot perform work involving climbing ladders/scaffolds, crawling or kneeling.  She can do no overhead work and only occasional reaching with the right upper extremity. [Plaintiff] must avoid all exposure to temperature extremes, high humidity or vibration.  She is limited to performing work involving simple, repetitive tasks.

(*Id.* at p. 11 of 23.)  The ALJ noted that, while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . , [Plaintiff]'s statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not credible to the extent they are inconsistent with the . . . residual functional capacity assessment."  (*Id.* at p. 12 of 23.)

Regarding Plaintiff's neck, back, and shoulder complaints, the ALJ cited several positive physical examinations conducted by Dr. Cantando (*Id.* at pp. 12-13 of 23) and an unremarkable consultative examination with Dr. Prince (*Id.* at p. 14 of 23).  Specifically, he cited appointments with Dr. Cantando in 2009 and 2010, during which Dr. Cantando observed that Plaintiff's neck and back were nontender, that Plaintiff had no palpable muscle spasms, she maintained full range of motion in her neck, and walked with a normal gait.  (*Id.* at p. 12 of 23.)  Following her surgery, Dr. Cantando noted that the pain in Plaintiff's right arm and shoulder subsided, but limited Plaintiff to lifting no more than fifteen pounds.  (*Id.* at p. 13 of 23.)  The ALJ

27

further noted that Plaintiff had another "good physical examination" with Dr.
Cantando several months thereafter (*Id*.), and that, upon physical examination by Dr.
Prince, the doctor reported that Plaintiff's neck was normal and revealed no
tenderness and that Plaintiff walked with a normal gait, had 5/5 strength, and
retained a full range of motion in her upper and lower extremities (*Id*. at p. 14).  She
did, however, have limited lateral flexion and rotation in her neck and limited flexion
in her spine.  (*Id*.)

   The ALJ likewise determined that diagnostic testing failed to support
the severity of Plaintiff's symptoms and alleged limitations.  (*Id*.)  He noted that
MRIs of her spine showed, *inter alia*, multilevel degenerative changes with a small
protruding disc herniation, moderate multilevel spinal stenosis at L2-S1, moderate
facet hypertrophy at L5/S1, and mild disc bulges but no syrinx.  (*Id*. at pp. 14-15 of
23.)  An MRI of her shoulder showed, at most, a probable tendon tear.  (*Id*. at p. 15.)
The initial postoperative x-ray of her spine demonstrated plate and screw fixation
and unremarkable cervical alignment.  (*Id*.)  Finally, a nerve conduction study
conducted by Dr. Jacob on June 23, 2008, was consistent with chronic cervical
radiculopathy at C5/C6.  (*Id*.)

   In addressing Dr. Jacob's medical records and opinions, the ALJ
reviewed two work status reports provided by Dr. Jacob, dated May 18, 2009 and
January 22, 2010, in which Dr. Jacob opined that Plaintiff may not return to work
until further notice as a certified nurse's aid and is limited to lifting no more than ten
pounds.  (*Id*. at p. 12 of 23.)  The ALJ gave little weight to these opinions, finding
that they were not supported by any objective diagnostic tests or physical
examinations.  (*Id*. at p. 13 of 23.)

The ALJ also gave no weight to Dr. Jacob's July 1, 2011 opinion that Plaintiff is unable to work, explaining:

> [Plaintiff] was seen by Emmanuel Jacob, M.D. at the Wyoming Valley Pain Clinic and Rehabilitation Center on July 22, 2011 for neck and back pain. Upon examination, Dr. Jacob reports that [Plaintiff] had cervical muscle spasm and lumbar tenderness. Dr. Jacob's [sic] refilled [Plaintiff]'s medication and recommended good health habits and home exercises. Dr. Jacob's readings of objective tests from September 2010 to December 2010 indicate the doctor's diagnoses of degenerative disc disease cervical and lumbar spine. A neuromuscular examination on July 1, 2011 indicates tenderness and muscle spasm of the cervical thoracic and lumbar spine as well as some decrease in range of motion. However, the claimant's straight leg elevation test was negative, her gait was stable and her biceps, triceps, ankle and knee reflexes were present and symmetric. Despite rather benign findings upon physically examining [Plaintiff], Dr. Jacob opine[d] on July 1, 2011 that [Plaintiff] is unable to sustain gainful employment. The undersigned gives no weight to this opinion since it is contrary to the doctor's own findings upon physical examination. Furthermore, his opinion is inconsistent with other evidence and physical examinations in the record which are normal.

(*Id.* at p. 13 of 23 (internal citations omitted).)

The ALJ likewise disregarded Dr. Jacob's opinion that Plaintiff is limited to sedentary exertion, explaining:

> The Social Security Administration accords controlling weight to the opinion of a treating physician where it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence. However, this rule does not apply to statements of opinion upon the ultimate issue of disability, which is reserved to the Commissioner. Moreover, the opinion upon the issue of disability expressed by Dr. Jacob is purely conclusory, without any supporting explanation or rationale. It is similar to form reports in which a physician's obligation is only to check a box or fill in a blank. Such conclusions are weak evidence at best.

(*Id*. at pp. 7-8 (internal citations omitted).)

Instead, the ALJ credited the opinions of Dr. Prince, finding that his opinions regarding Plaintiff's work-related abilities were consistent with his findings upon physical examination (*Id*. at p. 14 of 23), and Dr. Maas, finding that his opinions were consistent with the objective findings showing that Plaintiff is capable of work (*Id*. at p. 15 of 23).  In addition, although the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, he discredited Plaintiff's statements concerning the intensity, duration, and limiting effects of the alleged symptoms, characterizing them as inconsistent with the balance of the record.  (*Id*. at p. 12 of 23.)

The ALJ then determined that Plaintiff could not perform her past relevant work as a certified nurse's aid on the basis that she was limited to performing no more than light work.  (*Id*. at p. 16 of 23.)  However, based on the testimony of the vocational expert, the ALJ concluded that Plaintiff was not disabled because she had the residual functional capacity for work that exists in significant numbers in the national economy.  (*Id*. at p. 17 of 23.)

## C.   Plaintiff's Arguments

Plaintiff argues that the ALJ's finding that Plaintiff retained the residual functional capacity to perform a range of light work lacks the support of substantial evidence and is infected with legal error.  (Doc. 11, p. 27 of 35.)  Specifically, she contends the ALJ (1) improperly evaluated the medical evidence, and (2) improperly evaluated Plaintiff's subjective complaints.  (*Id*.)  The court will address each argument in turn.

## 1.   Evaluation of the Medical Evidence

Plaintiff argues that the ALJ improperly evaluated the medical evidence by disregarding the opinions of Plaintiff's treating physician. Specifically, Plaintiff contends that the ALJ's residual functional capacity determination is directly at odds with the opinions and assessment of Dr. Jacob. (*Id.* at p. 28 of 35.) Dr. Jacob, who is board certified in physical medicine and rehabilitation, treated Plaintiff since 2009 and provided several reports regarding the nature and severity of Plaintiff's impairments and the limiting effects thereof. (*See* Doc. 6-13, pp. 101-114 of 140, Doc. 6-14, pp. 35-38 of 111.) He opined, in pertinent part, that Plaintiff could sit for a total of six hours and stand or walk for a total of two hours during the course of an eight-hour workday, but that she needed to get up hourly to move around for five to ten minutes before returning to her seat. (Doc. 6-13, p. 104 of 140.) In this regard, the vocational expert testified that the requirement for short hourly breaks would render Plaintiff unemployable. (*Id.*) Dr. Jacob further opined that Plaintiff is limited to lifting no more than ten pounds, that her abilities to stand, walk, lift, or push were impaired due to her experiencing pain in her neck, shoulder, and mid back, and that she was unable to hold her neck in a constant position. (Doc. 6-13, p. 106 of 140; Doc. 6-14, pp. 35-36 of 111.) In short, Dr. Jacob concluded that the objective findings and Plaintiff's subjective complaints rendered Plaintiff totally disabled from returning to gainful employment. (Doc. 6-14, p. 38 of 111.)

In his decision, the ALJ disregarded Dr. Jacob's opinions, finding them to be unsupported by any objective diagnostic tests or physical examinations and purely conclusory without any supporting rationale. Plaintiff contends that her treating physician's opinions are entitled to greater weight than accorded by the ALJ

because they are not controverted by any physician to which the ALJ accorded more weight.

Defendant argues that Plaintiff's reliance on Dr. Jacob's opinions is misplaced for several reasons.  First, Dr. Jacob's opinions were not well supported by the medical evidence, and were inconsistent with other substantial evidence, including the clinical findings.  (Doc. 12, pp. 14-15 of 31.)  Second, the ALJ reasonably concluded that the objective evidence failed to reveal totally disabling limitations.  (*Id*. at pp. 17-18 of 31.)  Third, Dr. Jacob's opinions were inconsistent with other physicians' opinions, including that of Drs. Prince and Maas, both of whom assessed Plaintiff's functional limitations based on objective medical evidence.  (*Id*. at p. 18 of 31.)  Fourth, Defendant asserts that more than a diagnosis of a condition is required to show disability – "[t]o be disabling, pain must be so severe, by itself or in conjunction with other impairments, as to preclude substantial gainful employment."  (*Id*. at pp. 18-19 of 31 (quoting *Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2d Cir. 1983).)  Fifth, Defendant reiterates that a treating physician's opinions regarding a claimant's RFC or whether a claimant is disabled are not medical opinions, but are instead opinions on issues reserved to the Commissioner. (*Id*. at pp. 19-20 of 31.)

Finally, Defendant cites the following bases upon which Dr. Jacob's opinions were inconsistent with other evidence of record: 1) Plaintiff's physical examinations generally showed that she walked without difficulty and required no assistance to walk; 2) Plaintiff's examinations with Drs. Cantando and Chartlon showed that her back was nontender and her neck was supple with full range of motion; 3) Plaintiff's extremities had no discoloration, cyanosis, or edema; and 4)

Plaintiff generally had full strength, intact sensation, intact cranial nerves, and symmetric reflexes.  (*Id*. at pp. 14-16 of 31.)

The court concludes that the ALJ did not properly consider Plaintiff's treating physician's opinions in determining her RFC and, for this reason, the court cannot conclusively find that the ALJ's decision was based on substantial evidence.

An ALJ must give the opinion of a treating physician controlling weight if he finds the opinion "well-supported by medically accepted clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *accord Boggs v. Colvin*, Civ. No. 1:13-cv-0111, 2014 WL 1277882, *5 (M.D. Pa. Mar. 27, 2014) (citing Soc. Sec. Ruling 96-2p, 1996 WL 3741188, *2).  Indeed, "a cardinal principal guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted).

In choosing to reject a treating physician's opinion, the ALJ may not make "speculative inferences from medical reports and may reject [the opinion] only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation[,] or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999).  Instead, the ALJ must perform a detailed analysis of certain factors – namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source – in determining the

33

appropriate weight to give the opinion. *Foley v. Barnhart*, 432 F. Supp. 2d 465, 475 (M.D. Pa. 2005); 20 C.F.R. § 404.1527(c)(2)(i-ii); *accord Wilson v. Commissioner of Social Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

When confronted with contradictory medical evidence, "[t]he Commissioner is encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." *Foley*, 432 F. Supp. at 475 (quoting *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1995)). "The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." *Id*. Ultimately, the ALJ may choose whom to credit, but in these instances, there is an acute need for the ALJ to explain the reasoning behind his conclusions. *Foley*, 432 F. Supp. at 474 (citing *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001).

In accordance with these principles, an ALJ must always provide "good reasons" in his decision for the weight he gives to the treating source's opinion. 20 C.F.R. § 404.1527(c)(2). A decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson*, 378 F.3d at 544 (quoting *Soc. Sec. Rul. 96-2p*, 1996 WL 374188, * 5 (1996)). "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly where a claimant knows that her physician has deemed her disabled and, therefore, "might be especially bewildered when told by an administrative bureaucracy that she

34

is not, unless some reason for the agency's decision is supplied." *Id*. The Third Circuit has instructed that remand is appropriate where such an adequate explanation is not present. *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001); *see also* Wilson, 378 F.3d at 545 (instructing courts to remand "the Commissioner's decisions when they have failed to articulate 'good reasons' for not crediting the opinion of a treating source as [20 C.F.R. § 404.1527(c)(2)] requires").

   Here, the court finds that the ALJ's decision does not demonstrate that he properly rejected Plaintiff's treating physician's opinion. The ALJ concluded, *inter alia*, that Dr. Jacob's opinion as to Plaintiff's disability, as provided in his response to the October 12, 2010 questionnaire, "[was] purely conclusory, without any supporting explanation or rationale."[4] (*Id*. at p. 14 of 23.) As correctly recognized by the ALJ, Dr. Jacob's opinion as to the ultimate issue, *i.e.*, Plaintiff's ability to work, is not controlling because such conclusions are expressly reserved for the Commissioner. *Russo v. Astrue*, 421 F. App'x 184, 191 n.5 (3d Cir. 2011) (citing *Adorno v. Shalala*, 40 F.3d 43, 47-48 (3d Cir. 1994) ("We recognize, of course, that a statement by a plaintiff's treating physician supporting an assertion that she is 'disabled' or 'unable to work' is not dispositive of the issue.")); *see also* 20 C.F.R. § 416.927(e). However, contrary to the ALJ's stated reasoning, Dr. Jacob's opinion was well supported in his diagnostic findings and was not "purely conclusory." (Doc. 6-3, p. 14 of 23.) Rather, the record clearly indicates that Dr.

---

   [4] The ALJ also objects to the check-the-box format of the questionnaire completed by Dr. Jacob. (Doc. 6-3, p. 14 of 23.) The objection seems unreasonable in light of the fact that the questionnaire was accompanied by a detailed report. Moreover, the ALJ appeared not to be offended by the check-the-box format of the assessment forms submitted by Drs. Prince and Haas. (*See id.* at p. 8 of 23.)

Jacob attached to his "form report" his diagnostic findings containing his explanation and rationale supporting his conclusion. (*See* Doc. 6-13, pp. 101-112 of 140.) While it is solely the province of the Commissioner to make a finding regarding the ultimate issue of disability, the ALJ erred in this matter by rejecting the opinion of Plaintiff's treating physician because Dr. Jacob's opinion was clearly supported by the objective medical evidence attached to his report and contained in the administrative record.

The ALJ likewise erred in rejecting Dr. Jacob's subsequent opinion that Plaintiff remained unable to sustain gainful employment as provided in his July 1, 2011 report. In giving the opinion "no weight," the ALJ concluded that it was not only inconsistent with other evidence in the record but also contrary to Dr. Jacob's own "rather benign" findings upon physical examination. (Doc. 6-3, p. 13 of 23.) However, despite the ALJ's classification of Dr. Jacob's findings as "rather benign," the examination revealed muscle spasms, trigger points, muscle weakness, changes in sensation, and significantly restricted ranges of motion. (*Id.*) Nevertheless, the ALJ focused entirely on several unremarkable findings from the examination, including a stable gait and symmetric reflexes, and determined that Dr. Jacob's opinion was contradicted by his own examination. (*Id.*) As the Third Circuit has advised, however, "an ALJ is not free to set his own expertise against that of a physician who presents competent evidence." *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985).

Moreover, the court is baffled by the ALJ's apparent disregard for the substantial treatment relationship between Dr. Jacob and Plaintiff. While the record shows that Plaintiff had nearly forty office visits with Dr. Jacob between April 2009

and July 2011, the ALJ briefly mentioned only two such visits in his decision, both from July 2011. (Doc. 6-3, p. 13 of 23.) Moreover, the medical evidence contained in the administrative record shows that, beginning with his first examination of Plaintiff on April 16, 2009, Dr. Jacob's objective medical findings supported Plaintiff's subjective complaints, and he consistently determined that she was unable to return to work. In his decision, the ALJ never acknowledged the longevity of the treatment relationship and the consistency of Dr. Jacob's opinions throughout the pertinent period, and likewise seemingly failed to appreciate that Dr. Jacob's opinions were based on his continuing observation of Plaintiff's condition over a prolonged period of time. Instead, the ALJ regarded the treatment relationship as rather insignificant and rejected Dr. Jacob's opinions altogether. The ALJ erred in doing so as he was required to look at the entire, longitudinal picture as provided by Dr. Jacob and accord the treating physician's opinion the appropriate weight. Indeed, the opinions of treating physicians are to be given considerable weight, absent contradictory objective medical evidence, because

> these sources are likely to be the medical professional most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultive examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2). Based on his decision, the court cannot conclude that the ALJ properly considered Dr. Jacob's opinion.

Furthermore, regarding the ALJ's determination that Dr. Jacob's opinion is inconsistent with the other medical evidence, the court finds no medical evidence directly contradicting Dr. Jacob. As stated previously, the ALJ "may not

make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence . . . ." *Morales*, 225 F.3d at 317.  The evidence cited by the ALJ, however, is not contradictory.

For example, in discussing the evidence submitted by Dr. Cantando, the ALJ correctly noted that Plaintiff reported feeling better at her post-surgery follow-up visit on May 7, 2010.[5]  (Doc. 6-11, p. 20 of 95.)  At that time, Dr. Cantando advised Plaintiff that she could walk as tolerated and lift up to fifteen pounds.  (*Id.*)  However, at Plaintiff's next visit on July 23, 2010,[6] she reported an increase in her neck and bilateral shoulder pain which did not respond to injections, Skelaxin, or Percocet.  (Doc. 6-11, p. 32 of 95.)  Despite the ALJ's characterization of this visit as a "good physical examination" (Doc. 6-3, p. 13 of 23), Dr. Cantando observed muscle spasm in Plaintiff's trapezius bilateral trigger points, and reported that Plaintiff had pain over the bilateral bicepital tendons, right more than left, and over the bilateral AC bursa, left greater than right (Doc. 6-11, p. 33 of 95).  Dr. Cantando sent Plaintiff for an x-ray *that day* and advised Plaintiff to see pain management *that day* (*Id.* at pp. 32-33), suggesting that he recognized the severity of her pain. Furthermore, while the ALJ correctly noted that Dr. Cantando instructed Plaintiff that she could lift up to ten pounds, increasing by ten pounds per month as tolerated, the ALJ failed to acknowledge that Dr. Cantando also advised Plaintiff not to sit

---

[5]  The ALJ stated that this visit was on June 21, 2010 (Doc. 6-3, p. 13 of 23), but it was actually on May 7, 2010 (Doc. 6-11, p. 20 of 95).

[6]  The ALJ stated that this visit was on July 30, 2010 (Doc. 6-3, p. 13 of 23), but it was actually on July 23, 2010 (Doc. 6-11, p. 32 of 95).

upright for more than forty minutes, four times per day, and told her that she could walk "as tolerated." (*Id*.) The July 23, 2010 medical record was Dr. Cantando's last entry in the record, and Dr. Jacob's subsequent notes and reports indicate that Plaintiff was not able to tolerate lifting more than ten pounds or walking more than short periods. Significantly, and consistent with Dr. Cantando's instruction not to sit for more than forty minutes, Dr. Jacob opined that, in a work setting, Plaintiff would need to take short hourly breaks, a requirement the vocational expert found to be incompatible with Plaintiff's ability to maintain any type of substantial gainful employment.

        In addition, although the ALJ states that "the objective evidence fails to support the severity of [Plaintiff's] symptoms and alleged limitations," the summary that follows of the relevant MRI and electrodiagnostic studies (Doc. 6-3, pp. 14-15 of 23) supports Dr. Jacob's repeated and unequivocal opinions regarding Plaintiff's limitations (*see*, e.g., Doc. 6-13, pp. 110-111 of 140 & Doc. 6-14, pp. 35-38 of 111). Nevertheless, the ALJ concluded that this evidence actually contradicted Dr. Jacob's opinions. However, it is well-settled that an ALJ may not substitute his own judgment for that of a physician by independently reviewing and interpreting laboratory studies. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985).

        Finally, in each of these instances, the ALJ did not explain his application of the factors listed in 20 C.F.R. § 404.1527(c)(2)(i-ii) to determine the proper weight to accord Dr. Jacob's opinions, *i.e*., the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record

as a whole, and the specialization of the treating source.[7] *See Wilson*, 378 F.3d at 546.  The cursory manner in which the ALJ rejected Dr. Jacob's opinions runs afoul of the regulation's requirement to "give good reasons" for not crediting the opinion of a treating source upon consideration of the factors listed above.  While there may be sufficient evidence in the record to support the ALJ's ultimate decision that Plaintiff was not under a disability, and, thus, the same outcome may result from remand, the court cannot excuse the denial of a mandatory procedural protection on this basis.

Based on the above discussion, the court concludes that, given the state of the record, the ALJ failed to properly consider the treating physician's opinion and therefore, the court cannot say that the ALJ's decision is supported by substantial evidence.  Accordingly, the matter must be remanded for reconsideration of the weight to be accorded to Dr. Jacob's opinions.

### B.    Plaintiff's Credibility and Subjective Complaints

Plaintiff also contends that the ALJ erred in finding that Plaintiff's testimony concerning the intensity, persistence, and limiting effects of her pain was not credible insofar as it was inconsistent with the medical evidence.  It is well-established that an ALJ's findings based on the credibility of the claimant are to be

---

[7] The court appreciates that the ALJ stated that he considered the opinion evidence in accordance with the requirements of 20 C.F.R. § 404.1527.  (Doc. 6-3, p. 11 of 23.)  However, the pure recitation of such a statement unaccompanied by an actual analysis of the factors is insufficient.  Moreover, the court is not persuaded by the Commissioner's argument that the ALJ did, in fact, consider the required factors.  In this regard, the Commissioner contends that "the ALJ explicitly stated that Plaintiff 'sees Dr. Jacob, her pain management doctor,' thus recognizing the treatment relationship and Dr. Jacob's specialization, and found that his opinion was not supported by the record and was inconsistent with the evidence."  (Doc. 12, p. 24 of 31.)  This falls far short of the analysis contemplated by the regulation.

accorded great weight and deference, particularly since the ALJ is charged with the duty of observing the claimant's demeanor. *Chromey v. Astrue*, Civ. No. 4:11-cv-0103, 2012 WL 123548, *6 (M.D. Pa. Jan. 17, 2012) (citing *Walters v. Commissioner of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); *Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991)). Nevertheless, the court finds that, in evaluating Plaintiff's claims, the ALJ inappropriately considered Plaintiff's credibility and subjective complaints of her medical impairments.

In discussing Plaintiff's credibility, the ALJ stated:

> She initially testified that she socially isolates as a result of depression. She claimed that she does not go anywhere and has reduced concentration. However, a short while later she testified that she can use her extremities and even holding a phone for a short period of time is painful. Later in the hearing, she testified that she has a friend next door with whom she talks on the phone daily. That same friend helps with housework.

(Doc. 6-3, p. 12 of 23.) While the court will refrain from editorializing regarding typical socialization patterns of human beings, the court would be remiss not to express its flat-out rejection of the ALJ's reasoning. The ALJ discredited Plaintiff's testimony regarding her social isolation due to a perceived "contradiction" in her testimony. That Plaintiff speaks with her neighbor on a daily basis, or that the same neighbor assists Plaintiff with housework is a far cry from Plaintiff being a social creature and fails to serve as an adequate basis for discrediting Plaintiff's testimony regarding her social isolation.[8]

---

[8] To the extent that the ALJ found Plaintiff's statements not credible because she testified that she had difficulty holding the phone yet is able to speak to her friend on the phone each day, Plaintiff explained as follows: "[I]f I'm on the telephone, I can hold the telephone for maybe five minutes, and then, after that, I need to have my neck rested, and I usually put a pillow on the phone to

(continued...)

The ALJ likewise discredited Plaintiff's subjective complaints of pain. (Doc. 6-3, pp. 12, 14-15 of 23.)  Although he found that Plaintiff's medically determinable impairments could reasonably be expected to cause her symptoms, he concluded that Plaintiff's claims regarding the intensity, persistence, and limiting effects of these symptoms were inconsistent with the documented medical evidence.[9] The court disagrees.  It is well settled that "subjective complaints of pain must be seriously considered, even where not fully confirmed by objective medical evidence." *Sackett v. Astrue*, No. 4:cv-07-1848, 2008 WL 4453119, * 3 (M.D. Pa. Sept. 30, 2008) (citing *Green v. Schweiker*, 749 F.2d 1066, 1068 (3d Cir. 1984)). Where the claimant's testimony regarding pain "is reasonably supported by medical evidence, the ALJ may not discount claimant's pain without contrary medical evidence." *Id*. Here, plaintiff testified that she suffers from disabling pain, an assertion supported by Dr. Jacob's evaluation of her condition and by evidence of medical impairments which could reasonably be expected to produce the pain alleged.  The ALJ's decision to reject her complaints as unsupported is not justified in light of the record before the court.

For the above reasons, the court finds that substantial evidence does not support the ALJ's conclusions regarding Plaintiff's credibility and subjective complaints of pain.  Because remand is required for reconsideration of the weight

---

(...continued)
hold it up to my ear, because my arm gets so weak after a couple of minutes." (Doc. 6-2, p. 23 of 45.) Thus, Plaintiff's statements in this regard were not contradictory.

[9] In support of his conclusion that Plaintiff's testimony was overstated and inconsistent with the medical evidence, the ALJ provided a summary of largely irrelevant medical evidence (Doc. 6-3, p. 13 of 23) related to Plaintiff's sleep apnea and diabetes.  These impairments are not responsible for Plaintiff's allegedly disabling symptoms and functional limitations.

attributed to Dr. Jacob's opinions, the ALJ is directed to also review the record regarding Plaintiff's subjective complaints and make an appropriate finding on her credibility.  The court wants to be sure that, upon remand, the basis of the ALJ's credibility finding is clear and is made in the context of his reassessment of Dr. Jacob's opinions.

**III.**          **Conclusion**

For the reasons discussed above, the court concludes that remand is required as the court cannot conclude that the ALJ's decision to deny Plaintiff benefits was based on substantial evidence.

An appropriate order will issue.

s/Sylvia H. Rambo
United States District Judge

Dated:  April 8, 2014.